UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| RICK SCOTT, ROYCE D. KLEIN, JAMES MORRIS, and THOMAS MANGUM, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC.; UNITED HEALTHCARE SERVICES, INC.; UNITED HEALTHCARE INSURANCE COMPANY; and UNITED HEALTHCARE SERVICE LLC,<br><br>Defendants. | Case No. 20-CV-1570 (PJS/BRT)<br><br><br><br><br>ORDER |

Karen L. Handorf and Julie S. Selesnick, COHEN MILSTEIN SELLERS & TOLL, PLLC; June P. Hoidal, Carolyn G. Anderson, and Ian F. McFarland, ZIMMERMAN REED LLP; and William K. Meyer, for plaintiffs.

Jonathan D. Hacker, Brian D. Boyle, Elizabeth L. McKeen, and Amanda L. Genovese, O'MELVENY & MYERS LLP; and Michelle S. Grant, DORSEY & WHITNEY LLP, for defendants.

Plaintiffs participate in employer-sponsored group health plans administered by defendants (collectively "United") and governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. Plaintiffs bring this action under ERISA to challenge United's practice of cross-plan offsetting—that is, United's practice of using the assets of one plan to recoup alleged overpayments made by a different plan.

This matter is before the Court on United's motion to dismiss for lack of jurisdiction.  For the reasons that follow, the Court agrees with United that plaintiffs do not have standing because they have failed to allege an injury in fact.  The Court therefore grants United's motion and dismisses this case without prejudice.

## I.  BACKGROUND

The health plans at issue in this case are "employee welfare benefit plan[s]" under ERISA.  *See* 29 U.S.C. § 1002(1).  The plans are self-insured, meaning that the plans use their own assets to pay claims for covered healthcare expenses.  Am. Compl. ¶¶ 6, 51.  Self-insured plans are funded by contributions from the sponsoring employer and payroll contributions from the participating employees.  Am. Compl. ¶ 51.  A self-insured plan is in contrast to a fully insured plan, under which covered healthcare expenses are paid by an insurer under the terms of an insurance contract purchased by the plan.  Am. Compl. ¶¶ 51, 97, 99.

United acts as a third-party administrator for self-insured plans.  Am. Compl. ¶¶ 57; 130–31.  In that role, United accepts and processes benefit claims submitted by providers on behalf of plan participants, determines if the provider's services are covered by the plan, and uses plan assets to pay providers when required by the terms of the plan.  Am. Comp. ¶¶ 57, 100.

In this lawsuit, plaintiffs challenge United's use of cross-plan offsetting[1] to recover alleged overpayments to healthcare providers.  Cross-plan offsetting involves withholding a payment that is indisputably owed to a provider by a plan to "offset" a debt that the provider allegedly owes to a different plan on account of a prior overpayment.  Am. Compl. ¶¶ 58–59.  This Court has previously described the practice of cross-plan offsetting as follows:

> Suppose that a patient named Andy is insured under a health plan administered by United.  Andy sees Dr. Peterson for treatment of a sore neck.  Dr. Peterson submits his bill to United.  United pays $350 to Dr. Peterson.  Later, however, United discovers that it should have paid only $200 to Dr. Peterson.  United contacts Dr. Peterson, brings the overpayment to his attention, and asks him to return $150.
>
> If Dr. Peterson agrees that he was overpaid and returns the $150, the problem is solved.  But if Dr. Peterson does not agree that he was overpaid and refuses to return the money, United has limited options for getting back its $150.  In theory, United could initiate administrative or legal proceedings against Dr. Peterson.  As a practical matter, however, United is unlikely to do so, as United would spend far more than $150 in pursuing the $150 overpayment.
>
> Another option might be to engage in *same*-plan offsetting.  Under this approach, United would wait until Andy or anyone else covered by Andy's health plan is treated by Dr. Peterson.  When Dr. Peterson submits a bill to United on behalf of that patient, United would deduct $150

---

[1]United now refers to this practice as its "Bulk Recovery Process."  Am. Compl. ¶ 61.

>from the payment that it would otherwise make to Dr. Peterson. From United's perspective, however, same-plan offsetting presents a big problem: Dr. Peterson may never again treat Andy or someone who is insured under Andy's plan. Dr. Peterson practices in New York City, a giant metropolitan area. Andy may work for a small company in a distant suburb, and he may be insured under a company-sponsored plan that covers only Andy and 20 other employees. The chances may be slim that Dr. Peterson will ever again treat someone who is insured under Andy's plan. And thus, United may never have the opportunity to use same-plan offsetting to recoup its $150 overpayment from Dr. Peterson.
>
>To get around this problem, United adopted the practice of *cross*-plan offsetting. Under this approach, United merely has to wait until *anyone* covered by *any* of the thousands of plans that it administers sees Dr. Peterson. Suppose, for example, that two weeks after treating Andy, Dr. Peterson treats Betsy, who is injured while on vacation in New York City. Suppose further that Betsy is insured under a plan that is administered by United and that covers Betsy and 50 of her co-employees (all of whom live in San Diego). When Dr. Peterson submits a bill to United on behalf of Betsy, United would deduct $150 from the payment that Betsy's plan would otherwise make to Dr. Peterson and thereby recoup the overpayment that Andy's plan made to Dr. Peterson in connection with his treatment of Andy.

*Peterson ex rel. Patient E v. UnitedHealth Grp. Inc.*, 242 F. Supp. 3d 834, 837 (D. Minn. 2017), *aff'd*, 913 F.3d 769 (8th Cir. 2019).

Obviously, cross-plan offsetting dramatically expands United's ability to unilaterally recoup disputed overpayments from providers; as this Court has previously remarked, "[w]hen United and a provider dispute whether a claim was

overpaid, cross-plan offsetting allows United to act as judge, jury, and executioner." *Id.* at 838.  Cross-plan offsetting also benefits United in other ways.  Most strikingly, the fact that United administers both self-insured plans (under which United—as administrator—uses the plan's assets to pay claims) and fully insured plans (under which United—as both administrator and insurer—uses its own assets to pay claims) puts United in the position of being able to recoup its own losses from assets belonging to self-insured plans.  *Id.* at 839.  In addition, most self-insured plans impose financial penalties or other liability on third-party administrators for wrongful disbursement or mismanagement of plan assets (such as by making overpayments); cross-plan offsetting relieves United from liability for these errors.  Am. Compl. ¶¶ 101, 107.

United does a *lot* of cross-plan offsetting.  In 2019, for example, United recovered $1.354 billion through cross-plan offsets.  Am. Compl. ¶ 63.  Plaintiffs allege that cross-plan offsetting violates ERISA, and they seek to bring a class action on behalf of all participants in all self-insured health plans that are administered by United and governed by ERISA.  Am. Compl. ¶¶ 52, 173.  United moves under Fed. R. Civ. P. 12(b)(1) to dismiss plaintiffs' amended complaint for lack of jurisdiction.

## II. ANALYSIS

### *A. Standard of Review*

Defendants may make either a "facial" or a "factual" challenge to a court's jurisdiction under Rule 12(b)(1). In a facial challenge, the court "restricts itself to the face of the pleadings and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citation omitted). In a factual challenge, the court does not accept the allegations as true, but instead receives evidence and makes factual findings. *Id.* at 730.

United is making both a facial and a factual challenge. As it is clear on the face of the amended complaint that plaintiffs lack standing, however, the Court applies the standard for reviewing motions to dismiss under Rule 12(b)(6). In reviewing such motions, a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Perez v. Does 1–10*, 931 F.3d 641, 646 (8th Cir. 2019). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.

*B. Standing*

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Standing consists of three elements: "[(1)] an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The plaintiff bears the burden of establishing standing and must clearly allege facts demonstrating each element. *Id.* at 1547; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

1. Breach of Fiduciary Duty

In Counts I through IV(a),[2] plaintiffs bring claims under 29 U.S.C. § 1132(a)(2) for breach of fiduciary duty, alleging that United's practice of cross-plan offsetting violates its duty of loyalty as well as ERISA's prohibitions on self-dealing, representing both sides in a transaction, and transacting with a party in interest. Am. Compl. ¶¶ 185–208. In Count V, plaintiffs seek an injunction or other appropriate equitable relief under

---

[2]Plaintiffs' amended complaint contains six claims for relief, two of which are labeled "Count IV." Am. Compl. at 45–46. To distinguish between these two claims, the Court will refer to them as "Count IV(a)" and "Count IV(b)."

29 U.S.C. § 1132(a)(3) for United's breaches of fiduciary duty.  Am. Compl. ¶¶ 215–17.  The Court agrees with United that, because plaintiffs allege that these breaches caused injury to the *plan*—and not injury to *plaintiffs themselves*—plaintiffs lack standing under *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615 (2020).

The plaintiffs in *Thole* were participants in a defined-benefit pension plan.  *Id.* at 1618.  A defined-benefit plan "consists of a general pool of assets" from which "the employee, upon retirement, is entitled to a fixed periodic payment."  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (citation and quotation marks omitted); *see also* 29 U.S.C. § 1002(35).  In other words, benefits under a defined-benefit plan "do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions."  *Thole*, 140 S. Ct. at 1618.  Defined-*benefit* plans are in contrast to defined-*contribution* plans, "which provide[] for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses."  29 U.S.C. § 1002(34).

The *Thole* plaintiffs alleged that the defendant fiduciaries mismanaged the plan's assets, thereby causing the plan to suffer approximately $750 million in losses.  *Thole*, 140 S. Ct. at 1618–19. Like plaintiffs in this case, the *Thole* plaintiffs brought claims for

breach of fiduciary duty and sought repayment to the plan under § 1132(a)(2) and equitable relief under § 1132(a)(3). *Id.*

The Supreme Court held that the alleged $750 million loss to the plan was not sufficient to establish an Article III injury to the plaintiffs:

> Thole and Smith have received all of their monthly benefit payments so far, and the outcome of this suit would not affect their future benefit payments. If Thole and Smith were to *lose* this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny less. If Thole and Smith were to *win* this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny more. The plaintiffs therefore have no concrete stake in this lawsuit.

*Id.* at 1619. The Court rejected the argument that injuries to the *plan* constitute injuries to the plan *participants*, explaining that participants in a defined-benefit plan have no equitable or property interest in the plan. *Id.* at 1619–20. Likewise, the Court rejected the argument that the plaintiffs could sue as representatives of the plan without showing an injury to themselves. *Id.* at 1620.

*Thole* controls this case. Like the plaintiffs in *Thole*, plaintiffs in this case do not allege that they have been denied any benefits to which they are entitled. In particular, plaintiffs do not allege that they have submitted claims for healthcare expenses that have been wrongfully denied. Instead, they argue that they have standing by virtue of the fact that their plans are partially funded with their payroll contributions.

Specifically, they argue that, by engaging in cross-plan offsetting, United is misusing their payroll contributions and thereby causing them financial injury.

As plaintiffs acknowledge, however, participant contributions become plan assets as soon as they "can reasonably be segregated from the employer's general assets." 29 C.F.R. § 2510.3–102(a)(1). In other words, the contributions cited by plaintiffs—which were not only segregated from their employers' assets but actually paid over to their respective plans—do not belong to plaintiffs. Rather, they belong to the plan, forming part of the "general pool of assets" from which the plan pays benefits. *Hughes Aircraft Co.*, 525 U.S. at 439. A diminution of those assets does not affect plaintiffs' entitlement to benefits in any way and therefore does not cause plaintiffs any injury.

Plaintiffs try to avoid this conclusion by repeatedly implying that United is somehow misusing plaintiffs' own money. *See, e.g.*, ECF No. 57 at 17[3] (contending that their "'financial stake' is the return of Plaintiffs' contributions"); *id.* at 18 ("Unlike the plaintiffs in *Thole*, Plaintiffs have a direct financial interest in the funds they contributed to their Plans. When money is taken from their Plans . . . Plaintiffs suffer a 'monetary injury': the loss of their employee withholding contributions."). This is nothing more

---

[3]When citing documents by ECF number, the Court cites the document's internal pagination rather than the page numbers generated by the Court's electronic docketing system.

than rhetorical sleight-of-hand. The fact that plaintiffs contributed to the general pool of assets owned by their plans is irrelevant. Again, like the plaintiffs in *Thole*, plaintiffs in this case have no claim on plan assets (including those assets contributed by plaintiffs), and any loss of plan assets does not affect plaintiffs' entitlement to benefits. One could just as easily argue that employees have a claim on the assets of defined-benefit plans (such as the pension plan that was at issue in *Thole*) because employers create and contribute to those plans as a form of employee compensation. Regardless of the source of the plan's assets, the fact remains that the losses to which plaintiffs point are the losses of *plan* assets; injury is caused to the *plan*, not to *plaintiffs*.

In short, plaintiffs in this case are similarly situated to the plaintiffs in *Thole*. Just as in *Thole*, plaintiffs do not have any claim to the plans' assets; instead, their only claim is to receive the benefits to which they are entitled under their respective plans. While plaintiffs suggest that, in theory, the losses to a plan could be so great that plaintiffs would be personally affected—because, for example, the plan would lose the ability to pay benefits without forcing participants to make larger contributions—plaintiffs do not make such a claim in this case or allege facts that would make such a claim plausible. *See* ECF No. 57 at 2 ("United attacks two theories of standing which Plaintiffs do not rely upon, arguing that Plaintiffs have not suffered any injury because they have not lost health benefits or been balance billed."); *id.* at 22 ("Plaintiffs do not need to allege

that their payroll contributions have increased as a result of cross-plan offsets in order to state an injury. . . . [I]ncreased payroll contributions would be an additional, consequential injury for which relief could conceivably be sought under certain circumstances, but Plaintiffs do not do so in this case. Their loss of money is enough.").[4] Instead, plaintiffs rest their standing argument entirely on the injury that the *plans* suffer when *plan* assets are lost. That is precisely the type of injury that *Thole* holds is insufficient to confer standing on plan participants. *See Thole*, 140 S. Ct. at 1618–19 (alleging $750 million in losses to the plan).

Plaintiffs argue that *Thole* does not apply to employer-sponsored healthcare plans and cite several cases in support of their argument. In each of those cases, however, the plaintiffs alleged that *they*—and not (or not just) the *plan*—had suffered a loss because the challenged conduct had resulted in a denial or diminution of their benefits. *See Amy F. v. Cal. Physicians' Serv.*, No. 19-CV-6078 YGR, 2020 WL 5500370,

---

[4] Plaintiffs point out that they allege that "'additional or replacement contributions' had to be used to pay benefits when United takes contributions to fund its overpayment recoveries." ECF No. 57 at 22 (citing the amended complaint). Again, however, plaintiffs do not allege that they personally had to make additional or replacement contributions or that their plans had insufficient funds to pay benefits as a result of cross-plan offsetting. Instead, the basis for this allegation is that the plans experience a "shortfall"—in other words, a loss of plan assets, some of which consist of plaintiffs' payroll contributions—and that other plan assets, consisting of other payroll contributions, had to be used to pay benefits. *Id.* at 21–22 (plaintiffs' explanation of the "shortfall"). The problem with this argument is that *all* of these assets are *plan* assets in which plaintiffs have no interest.

at *2 (N.D. Cal. Sept. 11, 2020) ("Here, plaintiff alleges that Blue Shield breached its fiduciary duties by failing to act in accord with Plan documents and denying coverage for medically necessary treatment."); *Denise M. v. Cigna Health*, No. 2:19-cv-764-JNP-DAO, 2020 WL 5732321, at *1 (D. Utah Sept. 24, 2020) ("CIGNA denied [claims] for payment of D.G.'s medical expenses in connection with this treatment . . . ."); *Boley v. Universal Health Servs., Inc.*, 498 F. Supp. 3d 715, 724 (E.D. Pa. 2020) ("Unlike in *Thole*, Ms. Boley, Ms. Johnson, and Ms. Sutter have demonstrated loss to their own accounts with respect to each of their three claims.").

To be sure, plaintiffs in this case have characterized cross-plan offsetting as a denial of benefits, a type of injury that is sufficient to establish standing under *Thole*. *Thole*, 140 S. Ct. at 1619 ("If Thole and Smith had not received their vested pension benefits, they would of course have Article III standing to sue and a cause of action under ERISA § 502(a)(1)(B) to recover the benefits due to them."). But plaintiffs do not purport to rely on this theory of standing, *see* ECF No. 57 at 2, nor (as discussed below) do they allege any facts suggesting that any of them were subject to cross-plan offsetting.

Plaintiffs also cite numerous cases involving defined-*contribution* plans, arguing that courts "routinely find Article III standing where plaintiffs allege a reduction, diminution, or loss of defined contribution plan assets." ECF No. 57 at 12. Again,

-13-

though, plaintiffs stubbornly ignore the fact that they participate in defined-*benefit* plans, not defined-*contribution* plans.  The key feature of defined-contribution plans is that plan assets are segregated into individual accounts and each participant's benefits are based on the amount in his or her individual account.  *See Thole*, 140 S. Ct. at 1618 ("in a defined-contribution plan, such as a 401(k) plan, the retirees' benefits are typically tied to the value of their accounts").  Thus, the mismanagement of the assets in those individual accounts necessarily causes financial harm to the holders of the accounts.

As United points out, however, employer-sponsored healthcare plans are not defined-*contribution* plans; instead, they are closely analogous to the defined-*benefit* plan at issue in *Thole*, as participants are entitled to their contractually defined benefits regardless of the value of the plans' assets.  *Cf. Smith v. Med. Benefit Adm'rs Grp., Inc.*, 639 F.3d 277, 283 (7th Cir. 2011) ("The plan at issue here, however, is a group health insurance plan, which is the kind of defined benefit plan that . . . typically holds no assets in trust for any individual participant.").  The defined-contribution cases on which plaintiffs rely are therefore easily distinguishable.  *See Krauter v. Siemens Corp.*, 725 F. App'x 102, 109 (3d Cir. 2018) (plaintiff alleged that his 401(k) funds were moved to investments that charged higher fees and generated lower returns); *Harris v. Amgen, Inc.*, 573 F.3d 728, 735 (9th Cir. 2009) (plaintiff who had cashed out of the defined-contribution plan had standing because a favorable ruling would allow him to sue for

an adjustment of his benefits); *Jacobs v. Verizon Commc'ns, Inc.*, No. 16 Civ. 1082 (PGG), 2020 WL 5796165, at *6–7 (S.D.N.Y. Sept. 29, 2020) (plaintiff alleged that the value of her plan account was diminished as a result of an underperforming fund); *Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 792 (D. Minn. 2018) (plaintiffs alleged that funds in which they invested charged excessive fees and costs); *Innis v. Bankers Tr. Co. of S.D.*, No. 4:16-cv-00650-RGE-SBJ, 2017 WL 4876240, at *4 (S.D. Iowa Oct. 13, 2017) (plaintiff alleged injury to her own account as a result of plan's purchase of stock at inflated price); *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 156 (S.D.N.Y. 2017) (plaintiffs alleged that "they personally paid excessive fees" charged by one of the funds in the plan).

It is true that the plaintiffs in some of these defined-contribution cases were allowed to pursue claims involving alleged misconduct that did not affect them, while also pursuing claims involving alleged misconduct that did affect them. *See, e.g., Larson*, 350 F. Supp. 3d at 792 ("the fact that the representative Plaintiffs in this case did not invest in the ProManage option or the mutual fund window, does not prevent them from bringing a claim on behalf of the whole plan"). But a necessary predicate to a participant bringing broader claims on behalf of the plan is a showing of a concrete and particularized injury to the participant herself. *Id.* ("because Plaintiffs have standing to bring a claim, § 1132(a)(2) allows them to seek relief for the entirety of both Plans"); *see*

*also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 592–93 (8th Cir. 2009) (because the plaintiff alleged injury to his own defined-contribution plan account, he had standing to pursue relief on behalf of the plan that "sweeps beyond his own injury"). That necessary predicate is lacking in this case because plaintiffs allege only injuries to the plan and do not allege any injuries to themselves. *Thole* squarely holds that an injury to a plan that does not affect a plaintiff's benefits does not give that plaintiff standing to sue on behalf of the plan. As a result, plaintiffs in this case lack standing to pursue their fiduciary-duty claims.

### 2. § 503 Claim

In Count IV(b), plaintiffs bring a claim under § 503 of ERISA, 29 U.S.C. § 1133. Section 503 requires a plan to provide written notice of a denial of benefits and an opportunity for a "full and fair review" of the denial. *Id.*; *see also* 29 C.F.R. § 2560.503–1 (prescribing claims procedures pursuant to § 503).

Plaintiffs allege that, when United pays a provider by engaging in cross-plan offsetting (that is, when United pays a provider under one plan by forgiving the provider's alleged debt to another plan), that provider has not actually been paid and thus there has been a denial of benefits. United does not notify the participant of this "denial," however; instead, United informs the participant that his or her claim has been paid. Plaintiffs allege that, by misrepresenting that denied claims have been paid,

United is violating its duty under § 503 to provide written notice of denial and an opportunity for a full and fair review.

The most glaring problem with this claim is that plaintiffs do not allege any facts suggesting that any of their own benefit claims have been subject to cross-plan offsetting. Indeed, none of the plaintiffs even alleges that he personally saw a doctor or otherwise incurred a healthcare expense, much less that he saw an out-of-network doctor or incurred an out-of-network healthcare expense—the only type of expense that could possibly be the subject of a disputed cross-plan offset.[5]

At oral argument, plaintiffs requested discovery and, depending on what they learn in discovery, leave to amend this claim. Hr'g Tr. 9–15. But plaintiffs do not need discovery to know whether *plaintiffs themselves* incurred healthcare expenses that are potentially subject to a disputed cross-plan offset. Without such an allegation, plaintiffs have failed to plausibly allege any injury under § 503. The Court therefore agrees with United that plaintiffs lack standing to pursue this claim and grants United's motion to dismiss.

---

[5]United asserts that in-network providers have contractually agreed to accept cross-plan offsets as payment for their services, ECF No. 51 at 7–8, and plaintiffs do not contend otherwise. Plaintiffs admit that, if the provider agrees to cross-plan offsetting, then there has been no denial of benefits. Hr'g Tr. 31–32 [ECF No. 66].

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1. Defendants' motion to dismiss [ECF No. 49] is GRANTED.

2. Plaintiffs' amended complaint [ECF No. 46] is DISMISSED WITHOUT PREJUDICE for lack of jurisdiction.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  May 20, 2021                          s/Patrick J. Schiltz
                                              Patrick J. Schiltz
                                              United States District Judge